Filed 5/24/21  In re A.P. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B308511 (Super. Ct. No. 20JV00054) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE SERVICES, Plaintiff and Respondent, v. C.P. et al., Defendants and Appellants. | |

C.P. (Mother) and M.P. (Father) appeal from the juvenile court's order terminating their parental rights as to their

daughter A.P. (Welf. & Inst. Code,[1] § 366.26). Father asserts: (1) the juvenile court erred when it terminated his parental rights without finding that awarding him custody would be detrimental to the child, and (2) his counsel rendered ineffective assistance. We affirm as to Father.

After examination of the record, Mother's appointed counsel filed an opening brief stating that counsel was unable to identify any arguable issues. Mother's counsel advised Mother that she may personally submit any contentions she feels the court should consider and if she failed to do so within 30 days, her appeal would be dismissed. Mother has not presented any issues for the court's consideration. Accordingly, we dismiss Mother's appeal. (*In re Phoenix H.* (2009) 47 Cal.4th 835; *In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1096.)

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has a history of chronic substance abuse, criminal convictions, and neglecting her children. Her parental rights as to another child, born positive for methamphetamine and opiates, were terminated in 2011. A.P. was born in her maternal grandmother's bathtub in January 2020. Mother waited four hours to take A.P. to the hospital, where both tested positive for amphetamine and THC. Mother initially refused to provide Father's name and stated he was in prison and was a violent man.

Eighteen days after A.P.'s birth, Mother provided a drug test that was positive for methamphetamine. She failed to appear for a later test. After she fled to Utah and Nevada, A.P. and her siblings were taken into custody pursuant to a protective

---

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

2

custody warrant and returned to California. Mother began receiving substance abuse services but discontinued her participation and testing.

Father had a lengthy history of criminal convictions, domestic violence protective orders, and prison commitments. In June 2019 he was sentenced to 32 months in prison for evading a peace officer with disregard for safety.

Father was in a dating relationship with Mother for two years. He was not married to Mother, was not living with her when A.P. was born, and was not listed on the birth certificate. He was aware of the pregnancy and birth but was in prison when A.P. was born and did not meet her. He stated that if he was the biological father, he would like to be involved with A.P. and would like to care for her when released from prison. He stated that if A.P. was not placed with Mother, he would like her placed with his mother, sister, or aunt.

At the jurisdictional hearing in March, Father appeared in custody with counsel as the alleged father. The court ordered DNA paternity testing.

In May, Father appeared in custody with counsel for the dispositional hearing. The juvenile court sustained the dependency petition. (§ 300, subds. (b)(1), (g) & (j).) As to Mother, the court found clear and convincing evidence that returning A.P. to Mother would present "substantial danger" (§ 361, subd. (c)(1)), and found that "continuance in the [Mother's] home is contrary to the child's welfare." The court declared A.P. to be a dependent, ordered her removed from Mother's custody, and ordered the children placed with a foster family agency. The court denied reunification services for Mother. (§ 361.5, subds. (b)(11) & (b)(13).) The court ordered supervised visits for Mother.

The court made no findings or orders as to Father.

Collection of a DNA specimen was delayed until July 1 due to COVID-19 restrictions at the jail. A lab report dated July 9 showed a 99.99 percent probability that Father was A.P.'s parent. The lab report was included in a court report filed September 1.

Father appeared through counsel on September 1 for a section 366.26 hearing. Father had been recently released from custody but was working and was not present. His attorney stated that "he was incarcerated at the time this child was born, [and] I'm unaware of any method that would elevate him to more than alleged status at this time. Based on the information I have in the case, I don't see any basis for any exceptions under .26. So, on his behalf, at this point, I'll be resting." The court continued the hearing and ordered offers of proof be submitted.

On September 24, Father appeared through counsel. The court declared Father to be A.P.'s biological father.

On October 8, Father appeared with counsel for the continued 366.26 hearing. Counsel for Father and Mother stated they were unable to produce offers of proof and rested without presenting evidence. The court terminated Father and Mother's parental rights and referred the case for adoption services.

## DISCUSSION

### *Paternity status*

In dependency proceedings, fathers are divided into four categories: de facto fathers, alleged fathers, natural (biological) fathers, and presumed fathers. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) A presumed father has greater rights than a biological father. (*Id.* at p. 805.) Biological fatherhood is neither necessary nor sufficient to establish presumed

4

fatherhood. (*Id*. at p. 801.) Status as a presumed father requires satisfying the criteria of Family Code section 7611 such as receiving the child into his home and openly holding the child out as his natural child, marrying or attempting to marry the mother, or executing a voluntary declaration of parentage. (*Id*. at p. 802.) Only a presumed father is entitled to reunification services (§ 361.5, subd. (a)) or custody (§ 361.2). (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451*; In re Jerry P.*, at p. 801.)

Father forfeited the claim that he is the presumed father because he failed to raise the issue in the juvenile court. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.) It is not clear how soon before the 366.26 hearing he received the DNA test results, but he did not seek a continuance to attempt to establish presumed fatherhood.

Father contends that his lack of visitation with A.P. deterred his ability to elevate his status to presumed father. He forfeited this claim because he did not ask the trial court for visitation. Moreover, there is no evidence that visits with A.P. while Father was in custody or after his release would meet the requirements for presumed fatherhood, i.e., that he "*physically* bring the child into his home" (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051) and "assum[e] parental responsibilities." (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 147.)

This case is unlike *In re Julia U.* (1998) 64 Cal.App.4th 532. There, the biological father had only a casual relationship with the mother and was told that another man was the father. (*Id*. at p. 538.) The department of social services denied his requests for visitation even though he "was not incarcerated or otherwise unavailable to learn parenting skills." (*Id*. at pp. 542, 544.) We concluded that the trial court erred

5

when it terminated reunification services without providing an opportunity to establish presumed father status. (*Id*. at p. 544.) Here, Father was in a relationship with Mother for two years prior to his incarceration and had every reason to believe he was the father. "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." (*Id*. at p. 541.) Father made no effort to provide monetary or other support for the child and did not seek visitation. He was not available to establish presumed fatherhood because he was in custody until shortly before the section 366.26 hearing.

In his reply brief, Father contends he was a *Kelsey S.* father because Mother's conduct and the interference of a third party prevented him from establishing a relationship with A.P. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849.) We decline to consider this contention because it was raised for the first time in Father's reply brief. (*In re Ricky H.* (1992) 10 Cal.App.4th 552, 562.) We note, however, that a father's constitutional right to custody is not impaired when his own criminal conduct leads to incarceration that prevents him from establishing a parental relationship. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 680.)

### *Finding of detriment*

Father contends the juvenile court erred when it terminated his parental rights without making a finding that awarding him custody would be detrimental to A.P. He is incorrect.

Before terminating parental rights, due process requires a finding by clear and convincing evidence "that awarding custody of a dependent child to a parent would be

6

detrimental to the child." (*In re Z.K.* (2011) 201 Cal.App.4th 51, 65.)  This requirement is satisfied by a finding, such as was made here regarding Mother, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361 subd. (c)(1); *In re D.B.* (2018) 26 Cal.App.5th 320, 328.)

A finding of detriment is required only as to presumed fathers and *Kelsey S.* fathers.  (*In re T.G.* (2013) 215 Cal.App.4th 1, 5.)  "'"[A] biological father's 'desire to establish a personal relationship with [his] child, without more, is not a fundamental liberty interest protected by the due process clause.' [Citation]." [Citation.]' [Citation.]" (*Ibid.*)  A finding of detriment is not required to terminate a biological father's parental rights.  (*Ibid.*; *In re A.S.* (2009) 180 Cal.App.4th 351, 362.)

Father forfeited the detriment issue when he failed to raise it in the juvenile court.  (*In re T.G., supra*, 215 Cal.App.4th at pp. 13-14.)  While we nonetheless may exercise our discretion to review the issue, we decline to do so here because the case does not raise a novel issue of statutory interpretation, and because no evidence supports presumed fatherhood.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293-1294.)

### Ineffective assistance of counsel

Father contends he was prejudiced because his counsel rendered ineffective assistance when he did not request visitation, reunification services, presumed father status, or custody.  We disagree.

7

A parent has a constitutional right to effective counsel regarding termination of parental rights. (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1407.) To establish ineffective assistance of counsel, the parent "must demonstrate counsel did not act in a manner expected of reasonably competent attorneys and . . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Ibid*.) Father does not establish either requirement.

"'[C]ounsel is not required to make futile motions or to indulge in idle acts to appear competent. [Citations.]'" (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 225.) No section 388 petition for modification was required here because it would have been unsuccessful. (*In re Ernesto R.*, at p. 225.) Neither the DNA result nor Father's recent release from custody demonstrated a commitment to the child required to be a presumed father.

Nor has Father shown prejudice from the purported deficiencies in counsel's performance. There is no evidence that Father could have obtained the status of presumed father—he played no role in the child's life and was incarcerated for all but a short period. (See *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 586.) He could not "receive[] the child into [his] home" in prison. (Fam. Code, § 7611, subd. (d).) Whatever prison visitation might be possible for an infant would not allow "assumption of parent-type obligations and duties such as feeding, bathing, putting daughter to bed, changing her clothes, disciplining her, and other similar tasks" and would not create "'a fully developed parental relationship with the child.'" (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at pp. 142, 145, italics omitted.) It is not reasonably probable that visitation in custody, or during the brief period after Father's release, would establish the parental

8

relationship necessary to elevate his status to presumed father.

**DISPOSITION**

C.P.'s appeal is dismissed.  The order terminating M.P.'s parental rights is affirmed.

<u>NOT TO BE PUBLISHED.</u>

TANGEMAN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

9

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant C.P. (Mother).

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant M.P. (Father).

Michael C. Ghizzoni, County Counsel, Lisa A. Rothstein, Deputy County Counsel, for Plaintiff and Respondent.